# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

DONNY LEVY,                          )
                                     )
                 Plaintiff,          )
                                     )          **Judge Ronald A. Guzmán**
        v.                           )
                                     )          **07 C 4157**
MICHAEL J. ASTRUE, Commissioner      )
of Social Security,                  )
                                     )
                 Defendant.          )

## MEMORANDUM OPINION AND ORDER

Plaintiff Donny Levy ("Levy") has appealed the denial of his claim for supplemental security income. Before the Court are the parties' cross-motions for summary judgment. For the reasons provided in this Memorandum Opinion and Order, the Court denies plaintiff's motion, grants defendant's motion and terminates this case.

## Procedural History

On December 30, 2003, Levy applied for disability insurance benefits ("DIB") and supplemental security income ("SSI"), alleging a disability onset date of January 15, 1996. (R. 70-72, 353-54.) Levy's applications were denied initially and on reconsideration. (R. 53, 60.) He then filed a timely written request for a hearing, and, on August 14, 2006, Administrative Law Judge ("ALJ") Judith S. Goodie presided over the hearing. (R. 370-423.) At the hearing, Levy and Glee Ann L. Kehr, a vocational expert, testified. (*Id.*) Levy was represented by Stephen Weinstein, a paralegal, who amended the onset date of Levy's disability to May 3, 2003. (R. 372, 373-75.) The ALJ did not consider Levy's DIB application because the date on which he was last insured was December 30, 1999, and to receive DIB he must have been disabled on

or before the date his insured status expired.  (R. 23, 373-74; *see* 20 C.F.R. § 404.131.)  On December 29, 2006, the ALJ found that Levy was not disabled under the Social Security Act ("SSA"), and denied him SSI.  (R. 31.)  On May 24, 2007, the Appeals Council denied Levy's request for review and held that there was no reason under the SSA rules to review the ALJ's decision, thus making the ALJ's decision final.  (R. 5; *see* 20 C.F.R. § 416.1481.)  On July 24, 2007, Levy brought the instant action.

## Statement of the Facts

At the time of the administrative hearing, Levy was forty-nine years old, was seventy-four inches tall, and weighed 448 pounds.  (R. 26, 70, 394.)  He has a high school education and his past relevant work includes semi-skilled work as a security monitor, cleaning supervisor and taxi driver, as well as unskilled work as a mail room clerk and elevator operator.  (R. 30, 377, 417-18.)

On May 3, 2003, Levy was referred to the Haymarket Center as a result of behavior, and he was admitted for a psychiatric consultation due to chronic insomnia and a history of sleep apnea.  (R. 25, 185.)  This was the date to which Mr. Stephen Weinstein, Levy's representative, requested that the alleged onset date be amended.  (R. 25.)  During his consultation at Haymarket Center, S. Williams, a Licensed Clinical Professional Counselor, noted that Levy has three children, ages 22, 26 and 27, and was divorced after nine years of marriage.  (R. 185.)  He also noted that Levy said he last worked in 1996 but could not maintain a job because of his arthritis and leg pain.  (R. 185.)  At the consultation, Levy outlined his history of alcohol, cocaine and marijuana abuse, as well as blackouts he experienced in 1995 and 2003.  (*Id.*)  At that point, his

longest period of sobriety was eighteen months while he lived in Mississippi. (R. 186.)

Williams also noted that Levy took Prozac for two months in 1995, prescribed by a psychiatrist,

and participated in a sleep study in Jackson, Mississippi. (R. 185.) Williams found that Levy

was oriented in all spheres with an irritable mood, a blunted affect and fatigue. (R. 186.) Levy

denied homicidal or suicidal ideations, but reported some depression and occasional nightmares.

(*Id.*) Williams concluded that Levy needed: (1) a medical evaluation at Haymarket Center to

address his insomnia, (2) a referral for psychotherapy and follow-up medication management,

(3) assistance in applying for SSI benefits and (4) nasal strips to help Levy sleep. (*Id.*)

On May 6, 2003, Levy noted during a medical screening at Haymarket Center that he had

delirium tremors two years prior and his sister sexually abused him when he was three years old.

(R. 173, 174.) On May 7, 2003, the staff physician prescribed Trazodone, Ibuprofen and Zoloft

for Levy. (R. 171, 219.) Subsequent individual therapy notes from Haymarket Center ranging in

date from July to August 2003 indicate that Levy needed to develop a solid support system and

coping skills. (R. 156-63.) In July 2003, a physician prescribed Motrin for Levy's arthritis and

Bactrim for a urinary tract infection. (R. 215-16.) The progress notes from an August 2003 visit

to Haymarket Center indicate that Levy's progress was good and he needed to continue

counseling. (R. 156.)

In December 2003, Levy was seen by a physician in Stroger Hospital's emergency room

for pain on his left side and frequent urination. (R. 205-7.) The attending physician instructed

Levy to return on an "as needed" basis. (*Id.*) He returned on January 14, 2004 after complaining

of hearing voices and having difficulty sleeping. (R. 195-202.) The attending physicians found

Levy to have major depression with auditory hallucinations and major depressive disorder with

3

psychotic features. (R. 201-02.) They prescribed Zoloft and Rispendal and advised him to follow up with a psychiatric evaluation in February 2004. (*Id.*)

In April 2004, Levy was evaluated by Dr. Elizabeth Mirkin in the Sinai Psychiatric and Behavioral Health Department at Mount Sinai-Hospital Medical Center. (R. 222-43.) She assessed Levy with major recurrent depression with severe psychotic features and polysubstance dependence in full sustained remission. (R. 225.) She increased Levy's Zoloft dosage and recommended that he follow up with a therapist. (R. 226.)

In May 2004, Levy was evaluated by Dr. Harley Rubens at the request of the state agency acting under the authority and control of the Secretary of Health and Human Services ("the Secretary"). (R. 244-47.) Levy told Dr. Rubens that he had been living at the Haymarket House and worked at the Christian Industrial League, where he answered phones and served as a security guard. (R. 244.) He indicated that he was diagnosed with sleep apnea in 1995 and that he used a continuous positive air pressure ("CPAP") machine at night to help with breathing. (R. 245.) Levy also indicated that he performed routine daily tasks such as grocery shopping and laundry but did not cook for himself. (*Id.*) Dr. Rubens found Levy to have depression, probable sleep apnea, substance dependence probably in remission, and personality disorder with some dependent, avoidant and oppositional features. (R. 246.)

Also in May 2004, John Tomassetti, Ph.D., examined Levy's medical evidence at the state agency's request. (R. 248-75.) He found that Levy had a mild restriction in daily living, difficulty in maintaining social functioning and difficulty in maintaining concentration, persistence or pace with no episodes of decompensation. (R. 258.) He determined that Levy's mental impairments were not severe. (R. 248.) In January 2005, Examiner Boyenga Kirk

4

affirmed Tomassetti's conclusions. (R. 284.)

In June 2004, a Disability Determination Services physician (name unknown) reviewed Levy's medical records and noted that Levy had general aches and pains, but he did not have diagnosed arthritis in any joints. (R. 277.) The physician stated that Levy could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk about six hours in an eight-hour work day, sit about six hours in an eight-hour work day, and push and/or pull. (*Id.*) The physician found that Levy could frequently balance but only occasionally stoop, kneel, crouch and crawl, as well as climb ramps, stairs, ladders, ropes or scaffolds. (R. 278.) Lastly, the physician found that Levy should avoid concentrated exposure to (1) fumes and odors, *i.e.*, pulmonary irritants, due to his apnea and obesity and (2) machinery and heights due to his obesity. (R. 280.) In January 2005, Examiner Aquino Calixto reviewed these conclusions and concurred. (R. 285.)

Between April and July 2005, Levy was under the care of Dr. Nimmi Rajagopal, a urologist at Mile Square Health Center. (R. 308-15.) He told Dr. Rajagopal that a neurosurgeon at Cook County Hospital, Roberta Glick, had recommended surgical repair of a herniated disc. (R. 314.) Dr. Rajagopal noted Levy's severe obesity and gastro-esophageal reflux disorder, referred him to a nutritionist and encouraged him to exercise regularly. (R. 315.) She also prescribed pain and anti-inflammatory medications for his complaint of a herniated disc and advised Levy to elevate his legs whenever possible for his edema. (*Id.*) In June 2005, Dr. Rajagopal prescribed Doxazosyn, an anti-inflammatory drug, and noted Levy probably had high blood pressure. (R. 312-13.) In July 2005, Levy told Dr. Rajagopal that he was only taking Tylenol for his back pain and not the prescribed anti-inflammatory drug and reported that his

elevated blood pressure had been relieved.  (R. 310-11.)  He admitted to not using the CPAP machine regularly for his sleep apnea.  (R. 308.)  In October 2006, Dr. Rajagopal completed a physical residual functional capacity questionnaire, noting that she only treated Levy periodically from March 2005 to March 2006.  (R. 347-52.)  She did not manage Levy's back pain or his depression, and thus, she stated she did not feel qualified to comment on the type of work Levy could perform or the length of time for which he could perform it.  (R. 352.)

In August 2006, Mason Kelly, a licensed clinical social worker, assessed Levy and completed a mental impairment questionnaire to determine his ability to perform work.  He found that Levy had either "very good" or "limited, but satisfactory" abilities to perform unskilled work and "moderate" limitations with regard to the daily living activities, social functioning, concentration, persistence and pace to perform unskilled work.  (R. 301-03.)


## Discussion

This Court's review is limited to determining whether the Secretary's final decision "is both supported by substantial evidence and based on the proper legal criteria."  *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 538 (7th Cir. 1992).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  In reviewing the Secretary's final decision, a court may not re-weigh the evidence or reconsider credibility determinations made by the ALJ.  *Herr v. Sullivan*, 912 F.2d 178, 180 (7th Cir. 1990).  Thus, "the critical question here is not whether the Claimant is actually disabled, but rather whether substantial evidence supports the ALJ's conclusion that the Claimant is not disabled."  *Marco v. Apfel*, No. 97 C 6824, 1999 WL

311695, at *4 (N.D. Ill. May 13, 1999).  If reasonable minds could disagree as to whether an individual is disabled, a court must affirm the Secretary's decision.  *Books v. Chater*, 91 F.3d 972, 978 (7th Cir. 1996).

Levy first argues that the ALJ incorrectly evaluated his credibility.  (Pl.'s Br. 15-18.)  An ALJ's credibility finding will be set aside only if it is patently wrong and not supported by the evidence in the record.  *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  In determining credibility, the ALJ "must consider all of the evidence in the case record."  SSR 96-7p.  An ALJ's determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave the individual's statements and the reasons for that weight."  *Id.*  The ALJ's credibility finding is entitled to substantial deference and need not be reversed merely because the ALJ did not "specify which statements were incredible."  *Jens v. Barnhart*, 347 F.3d 209, 213 (7th Cir. 2003).

In Levy's case, the ALJ went into great detail about why she did not find his testimony entirely credible.  First, she points out the contradiction between Levy's testimony at the hearing and statements he made to a therapist at Haymarket Center regarding his time spent in jail.  (R. 28.)  Levy explains that he was confused between an arrest and a traffic citation.  (Pl.'s Br. 16.)  This may be the case, but an ALJ is in the best position to assess a claimant's honesty, and there is nothing in this record that indicates the ALJ's assessment was unfair or based upon serious errors in reasoning.  *See Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997).

The ALJ also found incredible Levy's testimony about his ability to sustain work and his attendance at his Christian Industrial League job.  (R. 28.)  Levy argues that the ALJ did not

consider the varied hours he worked at this job as a result of body stiffness. (Pl.'s Br. 16-17.) But, the ALJ noted that, in examining his earnings reports, Levy worked an average of thirty-five hours a week at the Christian Industrial League, not the twenty-four hours a week to which Levy had testified. (R. 28.) Again, there is nothing patently wrong with the ALJ's assessment.

Finally, the ALJ found that Levy's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Levy's statements about the intensity and severity of those symptoms were not entirely credible. (R. 28.) According to the ALJ, Levy's earnings records show that he is able to work an eight-hour work day and his own statements indicate that some of his symptoms are relieved by medication. (R. 407-08.) There is nothing in the record to indicate that these findings are patently wrong, and substantial evidence supports the ALJ's credibility determination in this case.

The Social Security Act authorizes disability benefits for those who are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less that 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether an adult claimant is disabled under the Act, the ALJ must address the following questions in sequential order:

1.   Is the claimant presently unemployed?

2.   Is the claimant's impairment or combination of impairments severe?

3.   Do his or her impairments meet or exceed any of the specific impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1 which the Secretary acknowledges to be conclusively disabling?

4.   If the impairment has not been listed by the Secretary as conclusively disabling, given the claimant's residual functional capacity, is the claimant unable to perform his or her past relevant work?

5. Is the claimant unable to perform any other work in the national economy given his or her age, education and work experience?

20 C.F.R. § 416.920(a)-(f); *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992). "A negative conclusion at any step (except for step three) precludes a finding of disability." *Young*, 957 F.2d at 389. "An affirmative answer at steps one, two or four leads to the next step. An affirmative answer at steps three or five results in a finding of disability." *Id.* "[P]laintiff has the burden of production and persuasion on steps one through four, and the burden shifts to SSA on step five to show ability to engage in some other type of [work]." *Terry v. Apfel*, No. 97 C 3369, 1998 WL 704322, at *1 (N.D. Ill. Sept. 24, 1998).

The ALJ found at step one that Levy had not engaged in substantial gainful activity since the amended disability onset date of May 3, 2003. (R. 25.) She found at step two that he had severe impairments of sleep apnea, severe obesity, recurrent major depressive disorder with psychotic features and alcohol, cocaine and marijuana abuse in remission. (R. 26.) However, at step three, the ALJ found that Levy does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (step three). (R. 26-27); 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926. Next, at step four, the ALJ found that Levy is capable of performing past relevant work as an elevator operator and a mail room clerk and he, therefore, is not disabled. The ALJ did not make a finding at step five because the negative finding at step four precluded a finding of a disability.

Levy contends the ALJ's step-three finding that his conditions did not meet or exceed the specific impairments listed in 20 C.F.R. Pt. 404, Subpt. P., App. 1, is erroneous. Specifically, Levy asserts that the ALJ improperly evaluated his arthritis, herniated disc, obesity and mental

impairments.  The Court addresses each in turn.

First, Levy argues that the ALJ failed to consider his history of arthritis.  The Secretary has listed several musculoskeletal impairments as conclusively disabling, including "[m]ajor dysfunction of joint(s) . . . [c]haracterized by gross anatomical deformity . . . and chronic joint pain and stiffness with signs of limitation of motion.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.02.  The finding of major joint dysfunction must be supported by x-rays, CAT scans, MRIs or the like showing joint space narrowing, bony destruction, or ankylosis of the affected joint(s)."  *Id.*; *id.* § 1.00C1.  To be considered disabling, such dysfunction must involve either:  (1) "one major peripheral weight-bearing joint (*i.e.*, hip, knee, or ankle), resulting in inability to ambulate effectively," *id.* § 1.02A, *i.e.*, an inability to "sustain[] a reasonable walking pace over a sufficient distance to be able to carry out daily activities of living," *id.* § 1.00B2b(2), or (2) "one major peripheral joint in each upper extremity (*i.e.*, shoulder, elbow, or wrist-hand), resulting in inability to perform fine and gross movements effectively," *id.* § 1.02B, *i.e.*, a very serious impediment to "the individual's ability to independently initiate, sustain, or complete activities," *id.* § 1.00B2c.

While it is undisputed that Levy has a history of persistent joint pain and body aches, there is no objective medical evidence to corroborate the degree of severity required to meet one of the listings described above.  Each reference in the record to Levy's history of arthritis are subjective references to his past medical history.  There is no record indicating an actual diagnosis of arthritis based on appropriate medically acceptable imaging or any indication of limitations associated with arthritis. (*See* R. 184, 185, 205, 207, 215-16, 225.)  Levy points to a May 2003 report by a licensed clinical professional counselor, S. Williams, indicating that he

could not maintain work in 1996 because of his chronic arthritis. This, however, is not objective medical evidence, but a statement made by Levy himself during his psychiatric consultation. Similarly, the record shows that an emergency room physician prescribed Motrin for Levy in July 2003, and noted that he was diagnosed with arthritis in Mississippi. However, there is simply no evidence that the emergency room physician made an actual diagnosis of arthritis based on medically acceptable imaging or concluded that Levy had any limitations based on this condition. (R. 216.) In fact, in June 2004, during a physical residual functional capacity assessment ("RFC"), the examiner noted that Levy's file lacked any significant finding "to show or demonstrate that he has arthritis in any joints." (R. 277.)

Even if there were evidence of a diagnosis of arthritis, the record shows that Levy's condition would not meet any listing of a musculoskeletal impairment because he reported that he could walk long distances. Indeed, only two weeks before he reported his alleged herniated disc to Dr. Rajagopal, Levy himself stated to Mason Kelly, a licensed clinical social worker at Mount Sinai Mental Health Center, that he walked four miles that day. (R. 317; *see* R. 325 (stating Levy reported that he lost three inches from waist by continuing exercise and walking frequently).) Moreover, there is no evidence to support a conclusion that Levy cannot perform fine and gross movements effectively. Therefore, the ALJ correctly determined that Levy's alleged arthritis was not an impairment that met or medically equaled one of the impairments listed by the Secretary.

Second, Levy avers that the ALJ did not properly consider his herniated disc. The Secretary has listed a "herniated nucleus pulposus" (more commonly known as a herniated disc) as an impairment, if there is: (1) "[e]vidence of nerve root compression characterized by neuro-

anatomic distribution of pain, limitation of motion of the spine, motor loss . . . accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting or supine)," 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A; (2) "[s]pinal arachnoiditis, confirmed by an operative note or . . . report of tissue biopsy, or by appropriate medically acceptable imaging," *id.* § 1.04B; or (3) "[l]umbar spinal stenosis . . . , established by findings on appropriate medically acceptable imaging," *id.* § 1.04C. In order to qualify as having a disorder of the spine under section 1.04, a claimant must support his claim with "detailed descriptions of the joints, including ranges of motion, conditions of the musculature . . . sensory or reflex changes, circulatory deficits, and laboratory findings, *including findings on . . . appropriate medically acceptable imaging*" like x-rays, CAT scans, MRIs, myelography or radionuclear bone scans. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00C1 (emphasis added). The finding of a bone disorder must include "a detailed description of the . . . neurological . . . findings appropriate to the specific impairment being evaluated," and "must be determined on the basis of objective observation during the [physical] examination *and not simply a report of the individual's allegation*." *Id.* § 1.00D (emphasis added). All of this must be supported by "a longitudinal clinical record" because "[m]usculoskeletal impairments frequently improve with time or respond to treatment." *Id.* § 1.00H1.

There is no objective medical evidence indicating that Levy has been diagnosed with a herniated disc. While it is undisputed that Levy complained of a herniated disc to Dr. Rajagopal in 2005 and told her he had been diagnosed with a herniated disc by a neurosurgeon at Cook County Hospital, there is absolutely no objective evidence in the record of this diagnosis or any finding of a herniated disc based on medically-acceptable imaging. Dr. Rajagopal neither

diagnosed Levy with a herniated disc nor ordered x-rays or any other imaging from which a diagnosis could be made, and, outside of her notations of his self-reported medical history, the record is devoid of any mention of a herniated disc. (R. 310-15.)

Levy argues that the ALJ should have developed the record more fully and sought medical records from Cook County Hospital relating to his alleged herniated disc, an issue that will be addressed more fully below. In the end, such an argument is futile because there is no evidence that the motion of Levy's spine is limited or that he has motor loss accompanied by sensory or reflex loss, as this impairment listing requires. Further, there is no indication that any treating physician imposed physical restrictions on Levy because of a herniated disc. Levy himself indicated in March 2005 that he can walk for a long distance and walk frequently. (R. 317, 325.) Neither his physical residual functional capacity ("RFC") assessment in June 2004 nor the review of this RFC in January 2005 mention that he has a herniated disc or indicate that his ambulatory ability is significantly limited. (R. 276-85.) In short, there is substantial basis in the record to support the ALJ's conclusion that Levy's alleged herniated disc was not an impairment that meets or medically equals one of the impairments listed by the Secretary.

Third, Levy argues that the ALJ failed to evaluate his major depressive order properly. The Secretary has listed certain categories of mental impairments, including, among others, affective disorders and substance addiction disorders as conclusively disabling. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.01. An affective disorder is "[c]haracterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." *Id.* § 12.04. "Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation." *Id.*

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. Medically documented persistence, either continuous or intermittent, of . . .

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

i. Hallucinations, delusions or paranoid thinking;

   . . . .

And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do

basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

*Id.*

There are substantial grounds in the record for the ALJ's conclusion that Levy's major depressive disorder does not meet the required criteria for a mental impairment. While it is undisputed that Levy said he had auditory hallucinations in early to mid-2004 and reported experiencing them several times a week in April 2004, there is no indication that these hallucinations created any marked difficulties or restrictions in his daily living activities, social functioning, or concentration, persistence or pace. (R. 173, 198-201, 232-33.) Further, the record shows that Levy's medication was adjusted in April 2004, and in May 2004, he had a psychiatric evaluation in which he "demonstrated no evidence of hallucinations, delusions or disorganized thinking." (R. 245.) Another psychiatric review, which assessed Levy in May 2004 and was reviewed by another physician in January 2005, indicated that he had only mild restrictions on daily living activities, maintaining social functioning, concentration, persistence or pace, and no episodes of decompensation. (R. 258.) Accordingly, there is substantial evidence in the record that supports the ALJ's determination that Levy's mental impairment does not meet the specific criteria of a depressive disorder.

Further, the ALJ did not find that Levy's severe impairments in combination met or exceeded the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1. In making that assessment, she clearly considered all of Levy's symptoms including his obesity and self-reported aches and pains. (R. 26-27.) Although Levy asserts that the ALJ failed to consider his obesity in combination with his arthritis and herniated disc, the record shows otherwise: "I have also considered whether the claimant's obesity might, by itself, be equivalent in severity to a listed condition, and have also thought about whether it could elevate the other impairments to listing-level significance. There is no evidence that either of these alternatives applies." (R. 27.) This conclusion is based on substantial evidence in the record in that Levy was capable of exercising, grocery shopping, doing laundry and attending a class once a week, despite his obesity. (R. 245, 317, 325.) Accordingly, the Court holds that the ALJ's findings and conclusion are supported by substantial evidence.

Because the ALJ's finding at step three is supported by substantial evidence, the Court continues to step four. The ALJ determined that Levy had an RFC to perform light work. "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). Light work also involves a good deal of walking or standing, sitting most of the time, and the ability to push and pull arm or leg controls. *Id.* If someone can do light work, they can also do sedentary work. *Id.*; *see Kapusta v. Sullivan*, 900 F.2d 94, 96 (7th Cir. 1989) ("[A] claimant can do sedentary work if he can (1) sit up, (2) do occasional lifting of objects weighing up to ten pounds, and (3) occasionally walk or stand."). When determining a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including medical source statements and descriptions from the

16

claimant and others about what the claimant can do. 20 C.F.R. § 404.1545(a)(3). An RFC determination is a legal, rather than a medical, one. *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995).

There is substantial evidence in the record to support the ALJ's finding that Levy is capable of performing light work. As mentioned above, his RFC assessment indicates that Levy can lift, carry, and push and pull up to twenty pounds occasionally and ten pounds frequently. (R. 277.) Additionally, it indicates that Levy can stand and walk for about six hours and sit for about six hours in an eight-hour work day, that he can occasionally climb stairs and ramps, stoop, kneel, crouch and crawl. (R. 277-78.) There is nothing in the record that indicates Levy is precluded from performing light or sedentary work as a result of either his arthritis or his herniated disc. In fact, the record supports the opposite conclusion. Though she noted Levy's alleged herniated disc, Dr. Rajagopal recommended that he start exercising regularly to address his severe obesity. (R. 315.) Levy's medical records from March 2005 show that Levy stated he was increasing his exercise regimen and had walked four miles on March 3, 2005. (R. 317, 325.)

Moreover, there is nothing in the record that indicates Levy is precluded from performing unskilled work as a result of his mental impairments. As mentioned above, Mason Kelly, LCSW, treated Levy for his mental impairments and diagnosed him with severe, recurrent major depressive disorder with psychotic features. Kelly indicated, however, that his impairments did not limit Levy's ability to perform unskilled work or result in any marked functional limitations. (R. 300-02.)

Once the claimant establishes his RFC, the ALJ compares the RFC to the requirements of the claimant's past relevant work. 20 C.F.R. §§ 404.1520(e), 416.920(e). Past relevant work

includes the claimant's job as he performed it, and his job as it is usually performed in the national economy.  SSR 82-61; SSR 82-62.  In the case at bar, the vocational expert ("VE") testified that Levy's jobs as an elevator operator and mail room clerk were light and unskilled as they are usually performed in the national economy.  (R. 420-21.)  In addition, the VE indicated that there were other jobs, such as office helper and counter clerk, in the national economy that an individual with Levy's RFC could perform.  (*Id.*)  Given Levy's RFC, there is substantial evidence to support the ALJ's finding that he could perform his past relevant work as it is usually performed in the national economy.

Levy argues that the ALJ did not properly consider his arthritis and the limitations associated with it, in formulating Levy's RFC finding.  The reports to which Levy points, however, merely rely on Levy's subjective reports of arthritis.  Aside from medications prescribed for pain relief and to reduce swelling, Levy does not point to anything in the record that objectively indicates a diagnosis of arthritis or any limitations it may impose on Levy or his ability to perform light, unskilled work.  The ALJ noted the subjective reports of arthritis made to Dr. Rajagopal by Levy, but did not afford these reports controlling weight because Dr. Rajagopal treated Levy for urological issues, not arthritis.  (R. 30.)  It cannot be said that the ALJ erred by failing to include these subjective reports of arthritis in Levy's RFC finding.  Further, the ALJ correctly determined that there was not a longitudinal clinical record of Levy's physical impairments relating to his arthritis.

Levy next argues that the ALJ did not properly consider his herniated disc in formulating the RFC finding.  However, the ALJ noted that there is nothing in the record to indicate a diagnosis for a herniated disc outside of Levy's self-report to his urologist, Dr. Rajagopal.  In

fact, the ALJ points out the conspicuous absence of any records from Cook County Hospital relating to the alleged herniated disc Levy mentioned to Dr. Rajagopal. (R. 30.)

Levy argues that the ALJ should have obtained his records from Cook County Hospital pursuant to her duty to develop the record fully when, like Levy, a claimant proceeds without counsel. *See Binion v. Shalala*, 13 F.3d 243, 245 (7th Cir. 1994) (stating that ALJ's burden is met if she "probes the claimant for possible disabilities and uncovers all of the relevant evidence").

To begin with, this Court is not entirely convinced that Levy proceeded without counsel. His representative, Stephen Weinstein, is a paralegal at the law firm of Daley, DeBofsky & Bryant—the same firm that is now representing Levy on this appeal. Weinstein had the firm's resources at his disposal to investigate and research fully Levy's impairments, including his herniated disc. The record is replete with requests made by Weinstein for Levy's medical records from treating physicians, therapists, and institutions, yet there is none specifically for documents relating to Levy's herniated disc or for records from the neurosurgeon mentioned in Dr. Rajagopal's reports. Moreover, the record shows that Weinstein affirmatively described himself as an "attorney" representing Levy at least twice: on an SSA hearing form dated February 14, 2005 and in a request for medical records to Dr. Rajagopal dated August 4, 2006. (R. 69, 306.) So, it is no wonder that until the date of Levy's SSA hearing on August 14, 2006, the ALJ was under the impression that Weinstein was an attorney. (R. 372.)

While the Court feels compelled to address the unusual facts surrounding Weinstein's representation of Levy, it is also keenly aware that he is, indeed, a non-attorney. The Seventh Circuit has not yet addressed the issue of whether an ALJ has a duty to request all records not

provided by the claimant when the claimant is represented by a law-firm employed paralegal, who identifies himself as an attorney until the day of the hearing. *Cf. Shaw v. Sec'y of Health & Human Servs.*, 25 F.3d 1037 (1st Cir. 1994); *Baker v. Bowen*, 886 F.2d 289, 292 n.1 (10th Cir. 1989).

The Court need not explore these uncharted waters. Even if it is assumed that Levy proceeded without counsel and that, because of this, the ALJ was obligated to develop the record fully and fairly, the Court holds that she did. Even if the ALJ had records from Cook County Hospital that conclusively diagnosed Levy with a herniated disc, those records would not have affected the RFC finding because Levy's own statements to other specialists indicate that he is capable of light, unskilled work. Again, at nearly the same time Levy told Dr. Rajagopal that he had a herniated disc, he told Mason Kelly that he could walk four miles and was exercising to address his weight issues. (R. 317, 325.) Thus, even if the ALJ had a duty to request records from Cook County Hospital, her failure to do so was harmless because the records would not have changed the RFC finding.

Levy also argues that the ALJ failed to include in the RFC finding Dr. Rajagopal's assessment of Levy's physical signs of edema and her advice to elevate his leg whenever possible. The ALJ determined that there was an insufficient longitudinal record to support Levy's need to elevate his leg for a prolonged period of time (R. 30), particularly because Levy saw Dr. Rajagopal only three times over the course of a year, and Dr. Rajagopal only noted observing his edema on a single occasion (*compare* R. 315 (noting edema up to knee on April 4, 2005), with R. 313 (no notation of observation of edema on June 13, 2005), and R. 311 (no notation of observation of edema on November 15, 2005)). Even if Dr. Rajagopal is considered

a treating physician (as Levy argues she should be) for purposes of his edema, her advice to elevate his leg whenever possible would not affect the Court's conclusion that the ALJ's findings were supported by substantial evidence.  As the ALJ correctly found, Dr. Rajagopal treated Levy for benign prostatic hypertrophy, urinary urgency and erectile dysfunction.  (R. 352.)  Dr. Rajagopal stated in a letter that "[d]ue to the fact that I did not manage either his depression or his chronic back pain, I am not qualified to comment on the specific details regarding the type of work he can tolerate and for how long."  (R. 352.)  There is no indication that Dr. Rajagopal thought that Levy's edema limited his physical capabilities.  There is substantial evidence to support the ALJ's conclusion that Dr. Rajagopal's opinion should be afforded little weight as to Levy's edema, particularly because she provided no opinion on the limitations it might impose on Levy.

Next, Levy argues that the ALJ did not properly evaluate his mental impairments when making the RFC finding because she failed to consider his auditory hallucinations or incorporate them into the hypotheticals presented to the VE.  Levy's hallucinations would impact the RFC if they caused him to be distracted and off-task approximately twenty percent of the time.  (*See* R. 421.)  As the Commissioner correctly argues, there is no basis for concluding that Levy's history of hallucinations would cause him to be off-task during the work day.  (Def.'s Br. 12; R. 233.)  Levy's therapist, Mason Kelly, noted that although he had moderate mental limitations, he had either "very good" or "limited, but satisfactory" abilities to perform unskilled work.  (R. 301-03.)  No mental health specialist indicated that Levy was precluded from all working because of his auditory hallucinations.  The ALJ's conclusions that Levy's mental impairments did not preclude him from his previous unskilled work, other kinds of unskilled light work or unskilled sedentary

work is supported by substantial evidence.  Thus, she properly concluded that Levy was not disabled at step four.

Levy finally argues that the ALJ failed to make a finding at step five.  (Pl.'s Br. 32.) Levy states that the ALJ did not incorporate all of Levy's limitations into her hypotheticals presented to the VE.  However, Levy did not indicate which limitations the ALJ failed to incorporate.  If he is referring to the ALJ's failure to include Levy's alleged herniated disc and his auditory hallucinations into the VE hypotheticals, there simply is no evidence in the record that either of those imposed any limitations on Levy's ability to perform light or sedentary unskilled work.  This issue was addressed above and will not be rehashed here.  Because the ALJ found that Levy was not disabled at step four, and was able to perform his past relevant work of mail room clerk and elevator operator, there was no need for the ALJ to continue to step five. *See* 20 C.F.R. § 404.1520(a).

## Conclusion

For the foregoing reasons, the Court grants defendant's motion for summary judgment [22], denies Levy's motion for summary judgment [17]  and terminates this case.

**SO ORDERED**                    **ENTERED:   10/15/08**

_____
          **RONALD A. GUZMAN**
          **United States Judge**